653 (finding that the subjects were teenage boys and the pictures contained detailed descriptions of each one).

Was the activity in this case related to explicit and graphic pictures of children engaged in sexual activity, particularly children about fourteen years of age or under, for commercial or exploitive purposes?  Were there multiple children so pictured? Were the children otherwise sexually abused? Was there a record that defendant repeatedly engaged in such conduct or other sexually abusive conduct with children? Did defendant move from place to place, or state to state, and repeatedly engage in production of such pictures of children? These questions are relevant to a determination on a case-by-case basis about whether the activity involved in a certain case had a substantial effect on commerce.

Corp was not alleged to be a pedophile nor was he alleged to have been illegally sexually involved with minors other than Sauntman, who was merely months away from reaching majority. Clearly, Corp was not the typical offender feared by Congress that would become addicted to pornography and perpetuate the industry via interstate connections.  Under these circumstances, the government has failed to make a showing that Corp's sort of activity would substantially affect interstate commerce.  Having reached this conclusion, we need not decide whether the conduct in this case was commercial activity within the meaning of *Morrison*.

Accordingly, we **REVERSE** Corp's conviction and sentence on the grounds that, reviewing the undisputed and unusual facts of this case, we are not persuaded that Corp's activity has a sufficient nexus with interstate commerce.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0002P (6th Cir.)
File Name: 01a0002p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

    *v.*                No. 00-1294

PATRICK J. CORP,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 99-00115—Gordon J. Quist, District Judge.

Argued: August 10, 2000

Decided and Filed: January 3, 2001

Before: KRUPANSKY, WELLFORD, and BOGGS,
Circuit Judges.

_____

### COUNSEL

**ARGUED:** Elena N. Broder-Feldman, JENNER & BLOCK, Washington, D.C., for Appellant.  Richard S. Murray, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Elena N. Broder-Feldman, Julie M. Carpenter, JENNER & BLOCK, Washington, D.C., for Appellant.  Richard S. Murray,

ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

HARRY W. WELLFORD, Circuit Judge. Patrick J. Corp pleaded guilty to one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B), conditioned on Corp's ability to appeal the constitutionality of his conviction. On this appeal, Corp claims that § 2252(a)(4)(B) is unconstitutional on its face because it exceeds Congress's Commerce Clause authority, and it is also unconstitutional as applied in this case because this offense does not have a sufficient nexus with interstate commerce. For the following reasons, we find that there is an insufficient nexus between this crime and interstate commerce to hold Corp accountable under the federal statute. Thus, we **REVERSE**.

## I. *FACTUAL BACKGROUND*

The facts below are taken from the presentence investigation report, to which the government takes no exception, and from the undisputed facts set out in the parties' briefs.

Corp, then a twenty-three year old resident of Big Rapids, Michigan, population of about 12,600, brought film to be developed at the Southland Pharmacy in Big Rapids. Being suspicious because of Corp's alleged comment that "these are sick" when he dropped off the film and because of the sexual content of the photographs, pharmacy employees contacted the local police.[1] The photographs were pornographic shots

_____

[1] Corp purportedly stated that "I know these are sick." Corp denied making that remark, however, claiming instead that he indicated the pictures were of a personal nature and he wanted them "counted from the

consequence of those findings, the government argues that "Congress found the manufacture and distribution of child pornography to be a commercial enterprise." Furthermore, the government argues, §2252(a)(4)(B) contains a jurisdictional element that ensures that the activity being prohibited has a sufficient nexus with interstate commerce, unlike the statutes invalidated in *Lopez* and *Morrison* which contained no such element.[11]

While we are faced with serious questions about the constitutionality of the Act under the Commerce Clause power of Congress, we choose not to declare the Act facially unconstitutional. Instead, we assume, along with the *Rodia* and *Robinson* courts, that *Morrison* and *Lopez* have required that the jurisdictional components of constitutional statutes are to be read as meaningful restrictions. Furthermore, we do not determine the aggregate effect on interstate commerce of the purely intrastate dealing in child pornography. Instead, we conclude that Corp's activity was not of a type demonstrated *substantially* to be connected or related to interstate commerce on the facts of this case. Under the undisputed circumstances here, Corp was not involved, nor intended to be involved, in the distribution or sharing with others of the pictures in question. Sauntman was not an "exploited child" nor a victim in any real and practical sense in this case. In the other cases that have addressed this issue, the courts were faced with the much more threatening situation where an adult was taking advantage of a much younger child or using the imagery for abusive or semi-commercial purposes. *See Rodia*, 194 F.3d at 469 (stating that the defendant had been charged with abusing children); *Bausch*, 140 F.3d at 740 (finding that the subjects in the photographs were fifteen and sixteen-year-old girls, and the pictures were being used by the defendant in their absence and perhaps for commercial purposes); *Robinson*, 137 F.3d at

_____

[11] At the same time, in its August 2, 2000 response to our direction to discuss the applicability of *Morrison*, the government concedes that "the presence of such a jurisdictional requirement does not automatically qualify a statute as constitutional under the Commerce Clause. . . ."

Rodia argued that child pornography has no relation to commerce because most child pornographers do not possess the pornography for commercial purposes. The court rejected that argument, commenting that the statute is not invalidated by the fact that some of the group is engaged in non-commercial activity. *Id.* at 480.

## C.  Application of the Law to the Facts of this Case

In addressing the constitutionality of § 2252(a)(4)(B), we must apply the framework of *Lopez* in light of the later case of *Morrison*. As we have stated, those cases have established that we must consider (1) whether the prohibited activity is commercial/economic in nature; (2) whether there is an express jurisdictional element in the statute; (3) whether Congress made specific findings about the prohibited activity's affect on interstate commerce; and (4) whether Congress's findings could be interpreted to establish a general federal police power or whether there is a sufficient link between the regulated activity and interstate commerce. *See United States v. Gregg*, Nos. 99-5079/5124/5205, 2000 WL 12681550, at *7 (3d Cir. Sept. 7, 2000) (recognizing that the four-part inquiry in *Morrison* is the Supreme Court's "most recent communique on *Lopez*'s third category of regulation").

The government argues that Congress intended to criminalize commercial activity involved in child pornography.[10]    Congress has indicated that "child exploitation" is operated by "elements of organized crime" with a "nationwide network . . . openly advertising their desire to exploit children." Child Abuse Victims Right Act of 1986, P.L. 99-591 § 702, 100 Stat. 3341-74 (1986). As a

---

[10]Congressional findings described child pornography as a "highly organized" activity operating on a "nationwide scale," involving "large numbers of runaway and homeless (exploited) youth . . . in the production and distribution of pornographic materials." Congress found the use of such children as "subjects" involved the "emotional and mental health of the individual and society." Response of Government, dated August 2, 2000, citing Child Protection Act of 1984, P.L. 98-292, § 2, 98 Stat. 204 (1984).

of young females. The police department investigated and contacted the principal of a high school in Reed City (population of about 2,400) to ascertain the possible identity of the females in the pictures.

Two of the females were identified as Sandra Sauntman, then 17 years old, and another younger female, both enrolled at the school.[2] Corp first began dating Sauntman when she was about seventeen. It was subsequently discovered, however, that another female in the pictures was Corp's then 26-year-old wife, Heather, with whom Corp has a young child. The pictures showed Heather engaging in sexual activity with Sauntman, but Heather was not a defendant in this case.

On or about April 8, 1999, police obtained and executed a search warrant at Corp's home and obtained the pictures in question from a photo album in Corp's bedroom. The photographs recovered had been taken sometime in late 1998 and on March 1, 1999, shortly before Sauntman attained her majority on April 7, 1999.[3] There is no allegation that Corp distributed the photographs, nor any indication that he gave copies to others, nor that he invited others to observe these photographs.[4] Corp stated in his motion to dismiss that in September of 1999, Sauntman "voluntarily posed for the

---

back side" so the developers would not view them. *See* Presentence Investigation Report, J/A 116.

[2]We are concerned in this case only with Sauntman, who testified at Corp's sentencing hearing and who is now of legal age. The other minor female was not portrayed either in the nude or engaged in any sexual activity.

[3]These dates are stated in defendant's brief in support of his motion to dismiss.

[4]The government's brief opposing defendant's motion to dismiss stated its concession that "it does not expect to show that Defendant intended or did distribute the images in question in interstate commerce."

photographs and does not want Defendant prosecuted." She ratified that assertion at the sentencing hearing.[5]

Corp was eventually charged in a four-count indictment with three counts of producing child pornography in violation of 18 U.S.C. § 2251(a), and with one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B). Federal jurisdiction was based on the fact that the photographic paper on which the pornography was produced was manufactured out-of-state, specifically in Germany. The § 2252(a)(4)(B) count charged that:

On or about April 8, 1999, in the Southern Division of the Western District of Michigan,

PATRICK JOHN CORP

did knowingly, intentionally and unlawfully possess one or more visual depictions. . ., the production of which involved the use of a minor engaged in sexually explicit conduct and which visual depictions were of such conduct, and which were produced using materials which had been shipped and transported in interstate and foreign commerce, that is Agfa photographic paper.

Corp moved to dismiss the indictment, arguing that the origin of the photographic paper outside the state of Michigan was an insufficient nexus with interstate commerce based upon *United States v. Lopez*, 514 U.S. 549 (1995). The district court denied Corp's motion on the grounds that the language in the statutes covering possession and production of child pornography "ensure[s] that each defendant, on a case-by-case basis, will be found to have [a] sufficient nexus

[5] The presentence report indicated that the Assistant United States Attorney handling the case believed Sauntman "blames the government and is supporting Mr. Corp." Further, it indicated that Sauntman believes she has been "showcased as a victim by the FBI, but not treated like a victim. . . she denies she has suffered any psychological harm as a result of the offense." She also stated that "[w]e never expected anyone else to even know about this; this was strictly something personal."

After rejecting the argument that the statute is saved by the mere inclusion of a jurisdictional element, the court looked to the other considerations in the *Lopez* inquiry and sought to determine "whether Congress had a rational basis for believing that the intrastate possession of pornography has a substantial effect on interstate commerce." *Id.* at 474. The court discussed the origin of Congress's effort to regulate child pornography and emphasized Congress's findings that the industry has a profound effect on commerce. *Id.* at 474-75. The court then discussed the relationship between intrastate and interstate pornography and concluded:

In this case, we think that Congress could have rationally reasoned as follows: Some pornographers manufacture, possess, and use child pornography exclusively within the boundaries of a state, and often only within the boundaries of their own property. It is unrealistic to think that those pornographers will be content with their own supply, hence they will likely wish to explore new or additional pornographic photos of children. Many of those pornographers will look to the interstate market as a source of new material, whether through mail order catalogs or through the Internet. Therefore, the possession of "home grown" pornography may well stimulate a further interest in pornography that immediately or eventually animates demand for interstate pornography. It is also reasonable to believe the related proposition that discouraging the intrastate possession of pornography will cause some of these child pornographers to leave the realm of child pornography completely, which in turn will reduce the demand for pornography.

*Id.* at 477.

Further, the court stated that "another way to describe the nexus between intrastate and interstate activity here is in terms of the notion of addiction," quoting from senate reports explaining that child pornography is addictive and, in time, escalates to more deviant behavior in the user. *Id.* at 478.

regulated falls within one of the three categories of congressional power." *Id.* at 473. With respect to § 2252(a)(4)(B), the court surmised that "[a]s a practical matter, the limiting jurisdictional factor is almost useless here, since all but the most self-sufficient child pornographers will rely on film, cameras, or chemicals that traveled in interstate commerce and will therefore fall within the sweep of the statute." *Id.* The court concluded:

> A hard and fast rule that the presence of a jurisdictional element automatically ensures the constitutionality of a statute ignores the fact that the connection between the activity regulated and the jurisdictional hook may be so attenuated as to fail to guarantee that the activity regulated has a substantial effect on interstate commerce. *See Lopez*, 514 U.S. at 561, 115 S.Ct. 1624 (implying that jurisdictional elements are useful only when they can ensure, through a case-by-case inquiry, that the regulated activity affects interstate commerce); *United States v. Jones*, 178 F.3d 479, 480 (7th Cir. 1999) (noting that the jurisdictional element of § 844(i), even if proven by the government, did not establish a substantial connection to interstate commerce; and therefore, looking beyond the jurisdictional element to assess the statute constitutionality; *United States v. Pappadopoulos*, 64 F.3d 522, 527 (9th Cir. 1995) (illustrating that a statutorily imposed requirement of a jurisdictional nexus to interstate commerce will not insulate the statute from judicial review).

*Id.* at 472-73. We agree with this reasoning in *Rodia*. The statute facially has an extremely wide sweep. Although commentators have generally spoken in terms of film or computers, the statutory terms have no such limitation. A painter using a model who was just under 18, even if it was his wife, would fall afoul of the statute if the paints, brushes, or canvas had traveled in interstate commerce, even long before enactment of the act.

with interstate commerce at least through use of development materials which have traveled in interstate commerce." (Citing *United States v. Bausch*, 140 F.3d 739, 741 (8th Cir. 1998), *cert. denied*, 525 U.S. 1072 (1999), and *United States v. Robinson*, 137 F.3d 652, 655 (1st Cir. 1998)).

After the denial of Corp's motion, the parties reached a conditional plea agreement in which Corp agreed to plead guilty to the single possession count (18 U.S.C. § 2252(a)(4)(B)), and the government agreed to dismiss the three production counts. The government also agreed to support the lowest sentence within the guideline range found applicable by the court, and stipulated that the circumstances of the case were outside the "heartland" of such cases without "necessarily support[ing] a downward departure." The government further agreed to allow Corp to appeal the district court's denial of his motion to dismiss for lack of a sufficient interstate nexus.

Corp was sentenced to five months imprisonment, plus supervised release and a $100 special assessment. The district court commented:

> You know, I tend to agree with your gut reaction to this. This is an awful stretch, it seems to me, of the interstate commerce clause. And I don't think it would hurt anyone to get that clarified. . . .
>
> . . .
>
> I think all the parties agree that the case is outside the heartland of the statute which is intended to punish people who engage in sexual abuse of minors by either abusing the minors or having pictures of such activity or sexual acts by minors.

The district court, at the same time, noted Corp's criminal background, including assault and battery convictions, but emphasized that Corp was "not a pedophile."

Corp now appeals his conviction.[6]

## II.  *ANALYSIS*

Corp argues that § 2252(a)(B)(4) is unconstitutional on its face and as applied in this case because it exceeds Congress's Commerce Clause powers.[7]  That section provides that an offender will be punished if he

knowingly possesses 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, **or which was produced using materials which have been mailed or so shipped or transported, by any means** including computer, if–

(i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(ii) such visual depiction is of such conduct.

18 U.S.C. § 2252(a)(B)(4) (emphasis added).  For purposes of § 2252, a "minor" is "any person under the age of eighteen years."[8]    18 U.S.C. § 2256(1).  The expression "child pornography" is frequently used in connection with legislation

---

[6]Corp has served most of the sentence imposed.

[7]Corp also argued that the application of § 2252(a)(4)(B) violated his rights under the First Amendment.  Because we hold in favor of Corp on Commerce Clause grounds, we do not address his First Amendment argument.

[8]At common law, a "child" was one who had not attained the age of fourteen years.  A "minor," according to Webster's dictionary, is "a person under full age or majority."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1966).  In some states, persons below the age of 18 may contract for marriage and, in a few states, without parental consent.

---

for these materials."[9]    *Id.* (citing *United States v. Winningham*, 953 F. Supp. 1068 (D. Minn. 1996)).

In *United States v. Bausch*, 140 F.3d 739, 741 (8th Cir. 1998), *cert. denied*, 525 U.S. 1072 (1999), the defendant was convicted under § 2252(a)(4)(B) based on his possession of pictures of two girls, ages fifteen and sixteen, depicting the girls in nude poses and sexual acts. *Bausch*, 140 F.3d at 740. The girls were models for Bausch's drawings, and Bausch used the photographs in the girls' absence. *Id.*  The camera used by Bausch was made in Japan. *Id.*  In upholding the statute, the *Bausch* court relied on the reasoning in *Robinson* but did not engage in any further in-depth analysis.  Like in *Robinson,* the court focused on the fact that § 2252(a)(4)(B) contained a jurisdictional element unlike the constitutionally infirm GFSZA. "Thus, the statute ensures, through a case-by-case inquiry, that each defendant's pornography possession affected interstate commerce." *Id.* at 741.

Finally, in *United States v. Rodia*, 194 F.3d 465 (3d Cir. 1999), *cert. denied*, 120 S. Ct. 2008 (2000), the Third Circuit upheld the statute, albeit using different reasoning.  The defendant pled guilty to the possession of child pornography, which included the possession of three Polaroid photos of naked boys in various sexually explicit poses.  *Rodia*, 194 F.3d at 469.  The court recognized that "[u]nlike the statute in question in Lopez, this statute has a jurisdictional element or 'hook'--that is, a clause that purports to ensure that the law only covers activity that has a substantial effect on interstate commerce." *Id.* at 468.  In a split decision, the court rejected the position adopted by the other courts that the jurisdictional "hook" in the statute automatically ensures its constitutionality.  The court reasoned that "[a] jurisdictional element is only sufficient to ensure a statute's constitutionality when the element either limits the regulation to interstate activity or ensures that the intrastate activity to be

---

[9]The court contrasted Congress's views and findings with respect to child pornography and gun possession in school zones, *see Lopez*, *supra*, with respect to the activities' impact on interstate commerce.

violent crime, regardless of how tenuously they might relate to interstate commerce."

*Id.* at 1751. The Court then concluded that the existence of congressional findings to justify the enactment of VAWA was "not sufficient, by itself, to sustain the constitutionality of [the] Commerce Clause legislation." *Id.* at 1752.

## B. Decisions from Other Circuits

Several courts have addressed the constitutionality of § 2252(a)(4)(B), and all have upheld the statute's validity pursuant to the *Lopez* framework. We shall address these cases in turn.

In *United States v. Robinson*, 137 F.3d 652 (1st Cir. 1998), the defendant was convicted under §2252(a)(4)(B) based on his possession of fifty photographs depicting boys in their mid-to-late teens in nude poses and sexual acts. All of the photographs included descriptive information about the boys, *e.g.*, names, ages, dates on which the photographs were taken. *Robinson*, 137 F.3d at 653. The pictures were made using a Kodak camera and Kodak film, both of which were manufactured outside the state of Massachusetts. *Id.* The First Circuit upheld § 2252(a)(4)(B) as a category three regulation — one that regulates those activities that substantially affect interstate commerce. *Id.* at 656. The court placed great importance on the fact that § 2252(a)(4)(B) contains a jurisdictional element, unlike the GFSZA. The court found that "[t]he jurisdictional element . . . requires an answer on a case-by-case basis to the question whether the particular possession of child pornography affected interstate commerce." *Id.* The *Robinson* court also found that "[b]y outlawing the purely intrastate possession of child pornography . . . Congress can curb the nationwide demand

of this type. In *Smith v. Daily Mail*, 443 U.S. 97, 100 (1979), a fourteen-year-old juvenile involved in a shooting of another juvenile was referred to by the Court as a "child."

A constitutional challenge to a statute is a question of law, which this court reviews *de novo*. *United States v. Smith*, 182 F.3d 452, 455 (6th Cir. 1999), *cert. denied*, 120 S.Ct. 2201 (2000); *United States v. Knipp*, 963 F.2d 839, 842-43 (6th Cir. 1992). "Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 120 S. Ct. 1740, 1748 (2000); *see also United States v. Rodia*, 194 F.3d 465, 469 (3d Cir. 1999), *cert. denied*, 120 S. Ct. 2008 (2000) (recognizing that "we must respect Congress's ample discretion to determine the appropriate exercise of its Commerce Clause authority").

## A. *Lopez* and its Progeny

Corp relies principally on *United States v. Lopez*, 514 U.S. 549 (1995), in making a Commerce Clause challenge to the statute at issue. Indeed, *Lopez* is the starting point for determining whether a particular statute constitutes an unconstitutional exercise of Congress's Commerce Clause power. *See Morrison*, 120 S. Ct. at 1748-49 (discussing the impact of *Lopez*).

In *Lopez*, the Supreme Court struck down the Gun-Free School Zones Act, 18 U.S.C. § 922(q)(1)(A) ("GFSZA"), which punished those who knowingly possessed a firearm within a school zone. In finding that the statute was unconstitutional, the *Lopez* Court explained that Congress may properly regulate three broad categories of activity under the Commerce Clause: (1) use of the channels of interstate commerce; (2) instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities; and (3) activities that substantially affect interstate commerce. *Lopez*, 514 U.S. at 558-59. The GFSZA fell under the third of these categories, because the possession of a gun, being

purely intrastate activity, purportedly had a substantial effect on commerce. *Id.* at 559. The Court held the statute to be unconstitutional because, among other things, the statute contained "no jurisdictional element that would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 561.

After the conviction in the instant case and after the filing of briefs on appeal, the Supreme Court decided *United States v. Morrison*, ___ U.S. ___, 120 S. Ct. 1740 (2000), which struck down the civil remedy provision of the Violence Against Women Act ("VAWA"). In that case, petitioner Christy Brzonkala, a student at Virginia Tech, allegedly was assaulted and repeatedly raped during the fall semester of her freshman year by some members of the school's varsity football team. After pursuing administrative remedies without success, Brzonkala sued her assailants and the university in federal court pursuant to § 13981, which provided that "[a] person . . . who commits a crime of violence motivated by gender . . . shall be liable to the party injured." Congress placed some limitations on § 13981, stating that "[n]othing in this section entitles a person to a cause of action . . . for random acts of violence unrelated to gender or for acts that cannot be demonstrated . . . to be motivated by gender." 42 U.S.C. § 13981(e)(1). Furthermore, the statute provides that it does not cover any state-law claim "seeking the establishment of a divorce, alimony, equitable distribution of marital property, or child custody decree." 42 U.S.C. § 13981(e)(4).

The Supreme Court applied the *Lopez* framework in addressing the constitutionality of § 13981, and suggested that four questions be raised in deciding a Commerce Clause controversy:

1) Is the prohibited activity commercial or economic in nature?;
2) Is there an express jurisdictional element involving interstate activity which might limit the statute's reach?;

3) Did Congress make findings about the effects of the prohibited conduct on interstate commerce?; and
4) Is the link between the prohibited activity and the effect on interstate commerce attenuated?

*See Morrison*, 120 S. Ct. at 1750-51. First, the court noted that the conduct being controlled by § 13981 (gender-motivated violence) was "not, in any sense of the phrase, economic activity." *Id.* at 1751. The Court determined that cases upholding Commerce Clause regulation of intrastate activity have done so "only where that activity is economic in nature." *Id.* Second, the Court found that, like the GFSZA, the statute contained no explicit "jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce." *Id.*

The Court acknowledged that, *unlike* the GFSZA, § 13981 did enjoy the support of congressional findings regarding the serious impact of gender-motivated violence on interstate commerce. *Id.* at 1752. The Court warned, however, that the existence of congressional findings, standing alone, is not sufficient to sustain the constitutionality of legislation, and that simply because Congress finds that a particular activity affected interstate commerce does not make it so. *Id.* The Court quoted a footnote in *Lopez* to support its premise that whether a certain activity sufficiently affects interstate commerce "is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court." *Id.* (quoting *Lopez*, 514 U.S. at 557 n.2 (citing *Heart of Atlanta Motel v. United States*, 379 U.S. 241 (1964))). The Court further stated:

[O]ur decision in *Lopez* rested in part on the fact that the link between gun possession and a substantial effect on interstate commerce was attenuated . . . . We rejected the "costs of crime" and "national productivity" arguments [which were supported by congressional findings] because they would permit Congress to "regulate not only all violent crime, but all activities that might lead to